Good morning, Your Honors. Evan Schwab, 10984, on behalf of Appellant Jeremy Siegel in this matter. At this time, with the Court's blessing, I would like to reserve five minutes for rebuttal, if the Court, if it's so pleased with the Court. In this case today, Judge, what we're, we have an interesting set of facts. We have the State of Nevada created a program that allowed for residential confinement for offenders who were on the tail end of their sentence to reintegrate them back into our society and let them earn and work. This was the 305 program that we talked about. In that, the state adopted rules and procedures that they had to follow if they wish to regulate the participation of individuals within the program, if they wish to bounce them from the program. He agreed to this program, didn't he? He did, Judge. And so, can you explain to me, then, what was the search or what was the seizure that you're, that you're complaining about? Sure. From the period of time from July of 2018 through October, when he was arrested, he would have officers and DPS come to his home in the Turnberry Towers at all hours. But under the conditions that he agreed to, though? We're not, the dispute, Your Honor, is not that there were certain searches and visits that were okay. Where I'm headed is the hour of the night, the frequency of the same. We're talking about 1 a.m. to 2 a.m. in the morning, that type of thing, and they were frequent. And what would happen at 1 or 2 a.m. specifically? Officers would come. Officers would come to his home and wake him up and his pregnant fiancee, and they would also, and the basis that we kind of, just the real quick basis, that sort of, there were these fabricated claims of failed BART tests or reporting. And that's, I mean, you're mixing up the Fourth Amendment and then the Fourteenth Amendment due process revocation claims. Judge Mendoza was specifically about the Fourth Amendment search and seizure. You know, parolees have to put up with the fact that they're going to have unannounced searches is one of the conditions. They agreed to that. That's baseline reasonable. What what takes this out of the baseline of the ordinary incidents of probation? Well, Your Honor, at the nail on the, or in this case, residential confinement. Yeah, Your Honor, at the nail on the head, the case law is very clear that they're, even in a parole probation type thing, there is a reasonableness component to the search. And if you look at cases such as NAPU v. Illinois, and I can get you all a side on that, anything that's a fabrication, a search based upon a fabricated thing, our contention in the lawsuit is that they executed these searches to bust him out of the program. And they searched phones. They searched person. They pretty much tossed his apartment every time they came in. And that's the search that was going on in this case, Judge. Well, let's, let me ask you about the due process claim. Because the Supreme Court in Morrissey v. Brewer has said that due process can apply to, procedural due process protection can apply to a probation, to a parole revocation. Do you have a case that says that a residential confinement, a shift from residential confinement back to prison confinement is subject to procedural due process protections? To be clear, Judge, there's not a case that says, hey, this program, the 305 program, there's a liberty interest that applies to that. The facts then, the interests that we present here are somewhat a case of new, a new case, if you will. But if you look at the short... Oh, but then... Go ahead, Judge. But then you have an additional problem. If it's a new and novel issue, they're also asserting qualified immunity defense. And generally, if the law is new and settled, qualified immunity is gonna apply. Well, and we indicated that they acted under the color of law of NRS 213 and 209 with regard to executing their searches, Your Honor. And additionally, when you talk about kind of what they did in this case, the big case is the Schwarzenegger case, which tells us that if you create a program and you make the rules, you gotta follow the rules. In this case, we got a young man who is autistic, has ADHD, he follows the rules... I mean, but that's not the normal approach to parole, because states do create parole systems, and if they are clear that they don't create liberty interests, the Supreme Court has said that it's still a matter of grace and procedural due process doesn't apply to the granting. It may have applied to revocation, but not to the granting. And our position, Your Honor, is that the liberty interest in this case, more along the Schwarzenegger analysis, more applies in the context of, if you create the program and you create the rules, you have a due process that is created, and there's a liberty interest in that due process. Now, for instance, you're not required to admit him to the program. No one's required to admit anyone to a program. Likewise, no one's required to admit someone to parole. But once you do, these things come into play, because otherwise we would have... Anytime an agency wants to violate its own rules and just violate people out of programs, or do engage in aggressive, egregious, and premeditated violations of their programs, they would just go ahead and do that, and they would rely on the case law saying, well, under Moore, we don't have any... There's no liberty interest. Counsel, can you help me understand your argument on the due process argument? Officer Portillo was dismissed from this case. So what... How is this still a due process? So Portillo... He was the hearing officer, right? Yeah, Portillo was the hearing officer. Your Honor correctly indicates that there was... The DPS defendants were dismissed from the case under the ones who executed parole and probation. They were dismissed under a motion to dismiss, and the final step was a summary judgment with... Judge Bulwer let Portillo in, let him remain in, and said that there was no qualified immunity. So he remained in, and that was a summary judgment where that was decided on that. And what we... And I can walk you through kind of how our theory of... Counsel, it doesn't look like you have a lot of time, so I don't think you can. Okay, I'll take it. I think I did reserve, so I'll take a seat here. Okay. You want to reserve the rest of the time for rebuttal? Yeah. Okay. I mean, if you have questions, I'm here for you all, so... Okay. All right. Thank you. So we'll hear now from Mr. Frost. Good morning. May it please the Court. My name is Jared Frost. It's my pleasure to represent seven current or former employees of the Nevada Department of Public Safety, more specifically their Division of Parole and Probation. This was the agency that supervised the appellant while he was assigned to a residential confinement program, before he became eligible for parole, serving his minimum sentence. And what this case is about from their perspective is an offender who was accustomed to living an affluent or luxury lifestyle, who felt he was an exception to the rules, and who never accepted the basic terms of his conditional release agreement, which is that residential confinement is a continuation of confinement, which involves some prison-like restrictions to an offender's movement and privacy. And there are three reasons, dispositive reasons, why I'd urge you to affirm the District Court's ruling in this matter. The first is that the District Court correctly determined that appellant failed to state a claim under any federal legal theory. Second, that the DPS defendants are entitled to qualified immunity. This is not a case... Can I focus on one of the particular claims, which is a due process claim? Because the District Court held that... So the Court rejects plaintiff's contention that he has a standalone due process claim arising from any DPS defendants' alleged fabrication of charges or evidence against him. So basically, the District Court held that the due process clause does not forbid a state official from fabricating charges and evidence to revoke the residential confinement. Is that your position, that that's correct, that there's no due process restraint on fabrication of evidence to revoke residential confinement? That's correct, Your Honor. So there are some protections where there is a protected liberty interest. There are procedural protections from Wolf that provide some... We've recognized, I mean, in Devereaux v. Abbey, we've recognized due process claims against state officials fabricating evidence against people. And I know at least the Second Circuit has applied that in the parole revocation context. So why wouldn't that apply here? Well, the reason it doesn't apply here is that not every change in custody results in these due process protections being applied. What we have here is a situation where... Well, but the allegation is fabrication, right? So it's not just any, it's specific fabrication of these allegations. Right. And again, so if there was a protected liberty interest, the due process clause might have something to say about this sort of situation. The problem that Mr. Siegel has is that the Nevada statute expressly states that there are no rights associated with continuation in the residential confinement program. But if Morrisey says that due process protections apply to the revocation of parole, so you release someone on parole with a degree of supervision and you yank them back into prison, that procedural due process protections apply to that. Why doesn't the same apply to residential confinement where you're out in the community, subject to supervision, you're yanked back into prison? Well, again, Your Honor, because it's not atypical or significant change in custody. This is an offender who's... That's not? I mean, this isn't moving from cell block A to cell block B. This is moving from, I assume he's in an apartment in Las Vegas and is yanked back into the big house. Right. Well, it's not atypical in the sense, in the relation to the ordinary incidence of prison life or experience. Again, this was an offender who was serving a sentence in traditional incarceration, who was permitted to be or assigned to a residential confinement program, which is actually more restrictive than a parole situation. It's somebody who had to be confined to his or her residence during weekends at any time that he wasn't working during a pre-approved work schedule. And so what happened here is that the alternative to that was, of course, incarceration. And when he was returned to incarceration, presumably in general population, that was exactly what was contemplated for someone, an offender of this category. And again, Your Honor, if there are any questions about what the due process applies in this sort of circumstances, what I urge you to do is to affirm on the grounds of qualified immunity. Again, we just don't have case law in this area. This is not the sort of case where every reasonable official would have understood that the alleged conduct would offend the Constitution. And finally, each of these seven individual defendants are arguing that they had specific roles or responsibilities related to Mr. Siegel's supervision. Some of them had significant contacts with Mr. Siegel. Some had essentially no contacts with Mr. Siegel. But they're all arguing that the allegation, the complaint, do not state a claim that they personally participated in an alleged constitutional violation. And for all those reasons, the defendants urge that the court affirm the ruling below. All right. Thank you, counsel. We'll hear rebuttal now. Thank you, Your Honor. I think kind of the... He said pretty much everything that we need to know when he said this. He said that no matter what the state does, as long as they make the rules, they can pull someone back, regardless of whether it's fair, reasonable or not. They can pull someone back. Did you adequately plead facts under Iqbal to support a fabrication claim? I mean, it's generally alleged that she was making up the violations, but is there any detail to those allegations? Yes, Your Honor. We pled facts indicating that especially Ms. Remmers was aware of the rules, what they were, that type of thing. She purposefully misstated them, and she went ahead, she fabricated reports that he wasn't... As you're saying it even now, I don't know that that's specific enough. You're saying somebody's aware of rules and that they doesn't tell... I mean, as I recall reading, I couldn't tell much more other than what you just said just now. I couldn't tell what was the precise rule and what she said that was wrong about it. Yeah, there are... I'll give you an example in the pleadings. There's talk about the emergency line when you... If you have like a family emergency, like a illness or something like that, if you have overtime, if you have X, Y, Z. She was well aware, and typically the program is used to... They're used to supervising people who work nine to fives, like I work nine to five at the diner. I'm pretty easy to find. He works in the community. The emergency rules about the... He would call into the hotline and indicate, hey, I'm going to be doing this for my business. And she would say, no, you can't do that. So we have specific examples of how she kind of created the rules as she went, especially going to a business meeting at a restaurant, that type of thing, attending a sporting event for marketing purposes. We have examples in the complaint where she would... That's not fabricating evidence. That's that she's being unduly restrictive in violation of the state rules governing the program. The fabrication of evidence is that she says that he failed all these BART tests, that that isn't the case. It's the totality of it all. If you look at the conduct that she engaged in, she was looking for any reason whatsoever to drum him out of the program. But fabrication is kind of a serious allegation, and it needs to be pledged with more specificity than generally she was overly contacting him. And I respectfully, Your Honor, I do believe we have it pledged with the specificity from day one, she didn't want him in the program. She made multiple statements about, you can't make your own rules, things like that. And she would document all these little instances that weren't actual instances. In fact, as we indicated in the complaint, every instance that she documented and the legal meaning behind it was objectively false. And that goes to the mindset. All right. Thank you, counsel. Your time has expired. All right. The case just argued will be submitted.
judges: COLLINS, VANDYKE, MENDOZA